UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Rep. Robert "Renny" Cushing, individually
and        in his capacity as Minority Leader of
the NH House of Representatives
Rep.  David Cote
Rep. Kendall Snow
Rep. Katherine Rogers
Rep. Paul Berch
Rep. Diane Langley
Rep. Charlotte DiLorenzo
New Hampshire Democratic Party

v.

Rep. Sherman Packard
Speaker of the NH House of Representatives
(in his official capacity only)
Paul Smith (in his official capacity only)
NH House of Representatives
State of New Hampshire

Civil Action No.: 22-CV-00018-LM

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION TO DISMISS</u>

Plaintiffs filed their First Amended Complaint ("FAC") on June 30, 2022, alleging violations of the Americans with Disabilities Act (Title II), the Rehabilitation Act (Section 504), the Fourteenth Amendment to the United States Constitution, Article 11 of the New Hampshire Constitution, and the First Amendment to the United States Constitution and Article 22 of the New Hampshire Constitution, and seeking declaratory and injunctive relief as well as reasonable attorneys' fees, including litigation expenses and costs. On September 23, 2022, Defendants filed their Motion to Dismiss. In the FAC, plaintiffs have pleaded sufficient facts to state a claim under the Americans with Disabilities Act (Title II), the Rehabilitation Act (Section 504), the Fourteenth Amendment to the United States Constitution, Article 11 of the New Hampshire Constitution, and

the First Amendment to the United States Constitution and Article 22 of the New Hampshire Constitution. For the reasons set forth in the Memorandum of Law filed herewith, this Court should deny Defendants' Motion to Dismiss.

## Standard of Review

"Under Federal Rule of Civil Procedure 12(b)(6), the court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and 'determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted.'" *Doe v. Trustees of Dartmouth Coll.*, No. 22-cv-018-LM, 2022 WL 2704275, at *1 (D.N.H. July 12, 2022) (quoting *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 71 (1st Cir. 2014) (internal quotation marks omitted)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The First Circuit has instructed the "plausibility" standard of *Ashcroft* and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), must be treated flexibly in discrimination cases:

> [S]ome latitude may be appropriate in applying the plausibility standard in certain types of cases…Generally speaking, these are cases in which a material part of the information needed is likely to be within the defendant's control . . . *Cf. Grajales*, 682 F.3d at 49 (noting that "'[s]moking gun' proof of discrimination is rarely available . . . at the pleading stage").

*Garcia–Catalan v. United States*, 734 F.3d 100, 104 (1st Cir. 2012). Further, it is generally accepted that, in the discrimination context, a court "cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence." *Cooperman v. Individ. Inc.*, 171 F.3d 43, 48-9 (1st Cir. 1999).

"In considering a Rule 12(b)(6) motion, the court may consider documents if they are integral to or sufficiently referenced in the complaint or if the parties do not dispute their authenticity without converting the motion into one for summary judgment." *Id.* (citing *Ironshore Specialty Ins. Co. v. United States,* 871 F.3d 131, 135 (1st Cir. 2017)).

Notably, the standard for deciding a motion to dismiss, is significantly different and more burdensome for the moving party than that applied to deciding a motion for a temporary restraining order or a preliminary injunction. While the Defendants rely heavily in their motion to dismiss on *Cushing v. Packard,* 30 F.4th 27 (1st Cir. 2022) (en banc), decided on limited record at least in part because Defendants chose to oppose Plaintiffs' motion "without also moving to dismiss," *see id.* at 35, making it impossible for Plaintiffs to move to amend the original Complaint as new facts and realities emerged rapidly throughout 2021 and 2022, nowhere do they acknowledge or address that the heightened standard applied to the relief *they* now seek fundamentally changes the way this Court must view the facts—originally alleged and newly pleaded—in the FAC, and the lens through which it should view the en banc opinion and parse in what ways that opinion does and does not apply to the FAC, which contains new facts and constitutional claims alleged against additional defendants, none of which were before the First Circuit.

## Factual Overview

Plaintiffs filed the original Complaint and accompanying motion for preliminary injunction early in the Covid-19 pandemic when they were faced with the constantly changing landscape of the pandemic, ongoing discrimination against them as legislators with disabilities qualifying under the Americans with Disabilities Act ("ADA") and the resulting

disenfranchisement of their constituents, and a shifting landscape that included changes to Mason's Manual of Legislative Procedure.

One aspect of the Defendants' approach to this case that has remained constant is their repeated insistence on minimizing the deadly risk that exposure to Covid-19 presents for those with severely compromised health and immune systems. Defendants continue to denigrate the mortal threat posed by their refusal to allow Plaintiffs reasonable accommodations by insisting that "given the trajectory of the pandemic, including the now widespread availability of treatments and vaccinations . . . , this is now a far less 'extraordinary' case that it was when the plaintiffs brought it." Doc. No. 51-1 (Memorandum in Support of Motion to Dismiss) at 24 14. Plaintiffs with that were true.

As set out in the FAC, while treatments and vaccinations may well have reduced the risk of death to more robust populations, they have not affected reduced the danger to those in the positions of defendants. While the Centers for Disease Control and Prevention ("CDC") has reduced the extent of its prophylactic recommendations for healthy people, these alterations in safety recommendations explicitly do not extend to elderly persons with serious health conditions and compromised immunity systems such as the defendant. Doc. no. 44 ("FAC") at ¶ 29.  When Representative Cushing contracted Covid-19, he was fully vaccinated and being successfully treated in one of the best hospitals in the world. Nonetheless, he is still dead because the onset of Covid-19 meant that he could not continue in his prescribed treatment program. His widow and children could perhaps be forgiven if they fail to appreciate the Defendants' claim that he did not face an unnecessary and lethal threat due to the extraordinary character of the Defendants' refusal to provide him with reasonable accommodations.

Furthermore, new variants with new dangers continue to evolve. The most recent variant prominent in the United States in general and in New England in particular has made the most useful of the treatments for the seriously ill (monoclonal antibodies) almost useless. Specifically, days ago on n January 8, 2023, the Washington Post reported, "XBB.1.5, pegged by the World Health Organization as 'the most transmissible' descendant yet of the omicron variant, rose from barely 2 percent of U.S. cases at the start of December to more than 27 percent the first week of January, according to new estimates by the Centers for Disease Control and Prevention. More than 70 percent of cases in the Northeast are believed to be XBB.1.5." The article grimly concluded, "In terms of very sick people with covid, it's almost exclusively elderly and people with lots of morbidities or who are immunosuppressed." Nirappil, Fenit and Weber, Lauren, "New variant XBB.1.5 is 'most transmissible yet, could fuel covid wave," *The Washington Post* (Jan. 8, 2023), available at https://www.washingtonpost.com/health/2023/01/08/new-covid-variant-xbb15/ (last visited Jan. 13. 2023). Plaintiffs are all "elderly with lots of morbidities and/or suppressed immune systems."

For a comprehensive aggregation of the latest medical studies that document the astonishing contagiousness of XXB.1.5, the Covid-19 variant now most common in this area, the alarming corresponding reduction in the effectiveness of treatments, and the particular dangers that Covid-19 continues to pose to the elderly and infirm, see the January 7, 2023, edition of This Week in Virology ("TWIV"), available at

https://podcasts.apple.com/us/podcast/this-week-in-virology/id300973784?i=1000592951389.

Further, as explained in the FAC, he unique circumstances of individual plaintiffs make it clear that a claim that the danger for them is mitigated to any degree is fully inconsistent with medical reality. For example, Plaintiff Cote has a documented history of cardiac disease

including a heart attack in 2018 which resulted in the insertion of four stents and suffers from coronary artery disease and high blood pressure. FAC at ¶ 30. *Nature* magazine released details of a study of the serious danger posed by any Covid-19 infection, no matter how mild, to cardiac patients such as Plaintiff Cote. The report headlines demonstrate the inaccuracy of Defendants' continued attempts to minimize the threat Covid-19 poses to Plaintiffs**—"Heart-disease risk soars after Covid—even with a mild case.  Massive study shows a long-term substantial rise in risk of cardiovascular disease, including heart attack and stroke, after a SARS-CoV-2 infection"** The study showed what it termed "stark increases' in the occurrence of no less than 20 different cardiovascular conditions and the **risk of heart failure itself to be increased by 72%."** Sidik, Saima May, "Heart-disease risk soars after COVID – even with a mild case," *Nature* (Feb. 10, 2022), available at https://www.nature.com/articles/d41586-022-00403-0 (last visited Jan. 13, 2023).

Plaintiff DiLorenzo is in her seventies and suffers from coronary artery disease. She has already had a serious stroke. In addition, exposure to Covid would create an extreme danger to her 79-year-old husband who has a chronic heart condition. FAC at ¶ 14.

Plaintiff Berch is 74 years old and had a heart attack recently received a kidney transplant hat require triple bypass surgery. He continues to suffer from coronary heart disease. Almost a year ago, he received a kidney transplant and has been re-hospitalized on at least two occasions due to infections. His immune system is so compromised that he is not eligible for Covid-19 boosters and currently relies on Evushield which has been described as the last line of protection for persons with his disability and severely compromised immune system. *Id.* at 12.  Recent studies have indicated that there is reason to believe that Evushield may not be effective against the newest Covid variants. *See* Food and Drug Administration ("FDA") advisories at

https://www.fda.gov/media/154701/download and

https://www.fda.gov/media/154701/download#page9 (last visited Jan. 13, 2023). Plaintiff Berch

recently lost a re-election bid where his inability to attend sessions in person was repeatedly

brought up, s*ee e.g.*, Green, Rick, "Two local lawmakers failed to vote in House this year," The

Keene Sentinel (June 6, 2022), available at https://finance.yahoo.com/news/two-local-

lawmakers-failed-vote-183500394.html (last visited Jan. 13, 2023), nor will it be feasible for him

to run again unless the reasonable accommodations sought in the FAC are provided to him.

The actions of the Defendants thus present these three plaintiffs with a heightened risk of

contracting no less than 20 types of coronary disease and increase their chances of a fatal heart

attack by 77%. These threats are in addition to those inherent in Covid-19 itself for the disabled

elderly and immunocompromised Plaintiffs. Additionally, persons like Renny Cushing and Paul

Berch face almost certain death when Covid-19 interferes with their ongoing treatments for

cancer and organ transplants.[1]

No matter how many times the Defendants assert that Covid-19 no longer presents a

significant threat to the general population of young and healthy adults, it is abundantly clear that

it continues to pose a lethal threat to those with the ADA-qualifying disabilities that afflict the

Plaintiffs. Rather than making the threat to Plaintiffs "less extraordinary", the advances in

medical knowledge on the effects of Covid-19 on the elderly and infirm make the Defendants'

---

[1] Defendants erroneously contend in their memorandum, "Remarkably, the plaintiffs also imply that—without a shred of support—that the defendants conduct contributed to the deaths of two of the original plaintiffs." Doc. No. 51-1 at 20. Not only did Plaintiffs imply no such thing, they specifically stated that they had no information whatsoever about whether original Plaintiff Rogers ever contracted Covid-19. The relevance of the role that Covid-19 played in the death of Minority Leader Cushing does not to any degree depend upon any implication of direct causality to the Defendants—at this stage such a link is simply unknowable. Rather, as explained herein, the significance of the role Covid-19 played in his death is directly related to the issue of whether the actions of the Defendants demonstrate such "extraordinary character" as to deprive the Defendants of any protection from the judicially created doctrine of legislative immunity.

indifference to the health and lives of their colleagues not only truly extraordinary but extraordinarily shocking.

## Argument

I.  **This Court cannot properly conclude at the motion to dismiss stage that legislative immunity bars Plaintiffs' federal claims.**

### A. Legislative immunity does not bar a claim against the State of New Hampshire.

The First Circuit decided that the State of New Hampshire was not a defendant in the original Complaint. *Cushing*, 30 F.4th at 37. It therefore did not reach the issue of whether the State could assert legislative immunity. It cannot.

#### 1.  The State itself cannot assert legislative immunity.

There are **zero** Supreme Court decisions — or Courts of Appeals decisions, to counsel's knowledge — which hold that a **State itself** can avail itself of legislative immunity as a defense. On the other hand, there are many decisions to the contrary.

State legislative immunity is a type of "official immunity." *Doe v. McMillan*, 412 U.S. 306, 319 n.13 (1973). Official immunities are meant to protect "government officials . . . from *personal* liability." *Forrester v. White*, 484 U.S. 219, 223 (1988) (emphasis added); *see also Hernandez v. Sheahan*, 455 F.3d 772, 776 (7th Cir. 2006) ("Official immunities (judicial, legislative, absolute, qualified, quasi, and so on) are *personal* defenses designed to protect the finances of public officials whose salaries do not compensate them for the risks of liability under vague and hard-to-foresee constitutional doctrines." (emphasis added)).

When the defendant in a lawsuit "is the governmental entity [rather than an individual] . . . the only immunities available . . . are those that the governmental entity possesses." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). A government entity such as the State therefore cannot avail itself of the personal defense of legislative immunity. *Wilson v. Houston Cmty. College Sys.*, 955 F.3d 490,

500 (5th Cir. 2020) ("[A]bsolute legislative immunity is a doctrine that protects individuals acting within the bounds of their official duties, not the governing bodies on which they serve. Thus, even if the actions of the state agency's members are legislative, rather than administrative, the state agency itself as a separate entity is not entitled to immunity for violation of the plaintiff's constitutional rights." (cleaned up)).[2]

Significantly, the government of the United States agreed with the above argument before the First Circuit. As the Department of Justice summarized: "Legislative immunity applies to only a limited class of parties. The immunity shields *individuals* from personal liability when they are performing their legislative functions. . . . It does not protect *the legislative body itself* as a government entity, as the weight of the Supreme Court precedent discussing the immunity doctrine confirms." DOJ br. at 14-15. Thus, "the doctrine of legislative immunity has no application in this action because the State, which is the real party in interest, cannot claim it." *Id.* at 22. Thus, the Plaintiffs' causes of action against the State are not barred.

### a. The State is a proper defendant and can be enjoined without implicating legislative immunity.

---

[2] S*ee also Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 677 n.* (1996) ("[legislative] immunity from suit . . . extends to public servants only in their *individual* capacities . . . ."); *Hafer*, 502 U.S. at 25, 29; *Forrester v. White*, 484 U.S. 219, 224 (1988) (discussing immunity from "personal liability"); *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 515 (1975) (Marshall, J., concurring) ("[T]he protection of the Speech or Debate Clause is personal."); *Scheuer v. Rhodes*, 416 U.S. 232, 239-241 (1974) ("The concept of the immunity of government officers from personal liability springs from the same root considerations that generated the doctrine of sovereign immunity. While the latter doctrine — that the 'King can do no wrong' — did not protect all government officers from personal liability, the common law soon recognized the necessity of permitting officials to perform their official functions free from the threat of suits for personal liability."); *Doe v. McMillan*, 412 U.S. 306, 319 n.13 (1973) (specifying that "legislative immunity" is a type of "official immunity"); *Tenney*, 341 U.S. 367, 379 (1951) (Black, J., concurring) (discussing "the personal immunity of legislators"); *see also Blackburn v. Snow*, 771 F.2d 556, 571 n.13 (1st Cir. 1985) ("Unlike individual defendants, local governmental entities may not interpose the defense of immunity.") (citing *Owen v. Independence*, 445 U.S. 622 (1980)); *Marks v. Tennessee*, 562 F. App'x 341, 344 n.2 (6th Cir. 2014) (in Title II case, court did not "rely on absolute judicial immunity, because [plaintiff] only seeks relief against the State"); *Joseph's House & Shelter, Inc. v. City of Troy*, 641 F. Supp. 2d 154, 157-58 (N.D.N.Y. 2009) (in Title II action, the "Defendant City is not entitled to assert the legislative immunity of its city council members as a bar to the claim against it."); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 623 F. Supp. 1466, 1482 (W.D. Wash. 1985), *aff'd* 823 F.2d 1349 (9th Cir. 1987) ("It should be noted that both legislative and official immunity are available only to individuals and not to the governmental entities themselves.").

The Defendants alternatively argue that even if Plaintiffs are correct and the State cannot assert legislative immunity, the claims against the State must still fail because the "State is not a proper defendant in this case at all" since the injunctive relief requested "must run against a legislator directly to be effective." *See* Doc. no. 51-1 at 10 (citing *en banc* opinion). This conclusion, however, is contradicted by Supreme Court precedent.

To start, it is beyond debate that the sovereign State itself — as opposed to merely a "department, agency, . . . or other instrumentality of a State or States or local government" — is a proper defendant in a Title II suit. 42 U.S.C. § 12131(1)(A); 42 U.S.C. § 12132. Obviously, "the State" is an intangible thing. It is the "residuary and inviolable sovereignty" that remained after "the States surrendered many of their powers to the new Federal Government" at the founding. *Printz v. United States*, 521 U.S. 898, 918-19 (1997). In New Hampshire, there are three branches of government, each of which has "limited authority to exercise action on behalf of the sovereign people." *State v. LaFrance*, 124 N.H. 171, 176 (1983); *see also* N.H. CONST., pt. I, art. 37 (discussing "the Legislative, Executive, and Judicial" as the "three essential powers" of the State). The New Hampshire Constitution vests the sovereign legislative power in the state Senate and House of Representatives. N.H. CONST., pt. 2, art. 2; *see also Monadnock Regional Sch. Dist. v. Fitzwilliam*, 105 N.H. 487, 495 (1964); *State ex rel. Pearson v. Hayes*, 61 N.H. 264, 325, 329 (1881).

The State is therefore a proper defendant under Title II. The State asserts, however, that "[Plaintiffs] seek relief that could only be implemented through the acts of government officials." Doc. no. 51-1 at 12. Thus, argues the State, "there is no principled reason why the State itself cannot invoke legislative immunity to the same extent as any of the other defendants." *Id.*

The State is incorrect. Most obviously, the law is clear that State itself *cannot* invoke legislative immunity. *See supra*. The State has not cited a single case which holds to the contrary. There are several "principled" reasons why the immunity is not available to the State. As discussed above, legislative immunity is a personal immunity meant to protect government officials from individual liability. When the State itself is the subject of the suit, no individual liability is in play. The State also has its own protections in the form of sovereign immunity. Where Congress, as with Title II, has seen fit to abrogate that sovereign immunity, the State is subject to liability and an appropriate target for court injunctions.

The fact that government officials would have to "carry out" the particulars of an order against the State is immaterial. In *every* case where the State itself is a defendant, a court judgment against the State must be effectuated by an agent of the sovereign. A damages award is paid from the state treasury. An injunction is carried out by a state employee. The fact that some individual agent or officer of the state carries out the judgment does not resurrect personal immunity defenses the State is not otherwise entitled to assert.

Rather, when a government entity is enjoined to do something, the individual government employee or officer is a necessary ministerial component of fulfilling the court judgment. Absolute immunity does not attach to purely administrative or ministerial actions. *Heyde v. Pittenger*, 633 F.3d 512, 517 (7th Cir. 2011) ("Absolute immunity . . . does not protect the official from acts that are ministerial or administrative in nature."); *Negron-Gaztambide v. Hernandez-Torres*, 35 F.3d 25, 28 (1st Cir. 1994) ("Acts undertaken by legislators that are administrative in nature do not 'give rise to absolute immunity from liability . . . .'" (quoting *Forrester*, 484 U.S. at 229)); *see also Bogan v. Scott-Harris*, 523 U.S. 44, 50 n.4 (1998) (noting the distinction between discretionary duties, which are protected, and ministerial duties, which are not protected).

In *Bogan v. Scott-Harris*, the Supreme Court recognized that "legislators were absolutely immune for their legislative, as distinct from ministerial, duties." *Bogan*, 523 U.S. at 51. The Court then specifically addressed the situation before this Court. The defendants in the *Bogan* case argued that a prior Supreme Court case (*Amy v. Supervisors*, 78 U.S. 136 (1871)) stood for the proposition that local legislators did <u>not</u> enjoy legislative immunity. *Id.* at 51-52. The Supreme Court disagreed:

> In the few [historical] cases in which liability did attach, the courts emphasized that the defendant officials lacked discretion, and the duties were thus ministerial. . . . Respondent's heavy reliance on our decision in *Amy v. Supervisors*, 78 U.S. 136, 11 Wall. 136, 20 L. Ed. 101 (1871), is misguided for this very reason. In that case, we held that local **legislators could be held liable for violating a court order to levy a tax sufficient to pay a judgment, but only because the court order had created a ministerial duty**. *Id.*, at 138. The treatises cited by respondent confirm that this distinction between legislative and ministerial duties was dispositive of the right to absolute immunity.

*Bogan*, 523 U.S. at 51-52 (emphasis added).

The case cited in *Bogan* is instructive. In that case, the plaintiff recovered a judgment against a county government in Iowa. *Amy v. Superivsors*, 78 U.S. 136, 136 (1870). The government refused to pay, and so a writ of mandamus issued from the federal court against <u>individual county legislators</u>, "whereby they were commanded to levy a tax sufficient to pay the judgment and costs." *Id.* The county legislators did not, and the plaintiffs filed suit against the officials to hold them personally liable. *Id.* at 136-37.

The Supreme Court held that the individual county legislators *could* be held personally liable. *Id.* at 138. The Court explained that "where the law requires absolutely a ministerial act to be done by a public officer, and he neglects or refuses to do such act, he may be compelled to respond in damages to the extent of the injury arising from his conduct." *Id.* In other words, as

Justice Thomas summarized in *Bogan*: the *Amy* Court held that "legislators could be held liable for violating a court order to levy a tax sufficient to pay a judgment . . . because the court order had created a ministerial duty." *Bogan*, 523 U.S. at 51. Thus, no legislative immunity attached, even though the trial court was mandating legislators to perform acts which would otherwise be deemed "legislative" in nature. *See id.* at 51-52.

Other cases support the conclusion that when judgment enters against a government entity, enforcement of that judgment can run against individual officials without regard to personal immunities.

In *Spallone v. United States*, the Supreme Court considered an appeal from city councilmembers in Yonkers, New York. 493 U.S. 265, 268 (1990). The district court had found that the City had intentionally perpetuated racially segregated housing. *Id.* It ordered the City to take "affirmative steps to disperse public housing throughout Yonkers." *Id.* at 269. The City, however, did not comply with the district court's mandate. *Id.* at 271. Four members of the city council voted <u>against</u> a legislative package that would have effectuated the trial court's orders, defeating it four votes to three. *Id.* at 272.

As a result of the "no" vote on the housing legislation, the trial court found <u>both</u> the City and the nay-voting councilmembers in contempt. *Id.* It ordered that each be monetarily fined until the legislation was passed. *Id.* at 271-72.

The councilmembers appealed the sanctions, in part relying on the defense of legislative immunity. *Id.* at 273. The Second Circuit rejected their appeal, and the councilmembers sought review by the Supreme Court. *Id.*

On appeal, the Supreme Court reversed the contempt sanctions against the individual councilmembers. However, it did not do so because of legislative immunity. The Court deemed it

"unnecessary to reach" the question of legislative immunity, because it found that the contempt sanctions were "an abuse of discretion under traditional equitable principles." *Id.* at 274.

The Court stated that, "in selecting contempt sanctions, a court is obliged to use the least possible power adequate to the end proposed." *Id.* at 276 (citation omitted). The Court reasoned that the trial court should have started by just imposing coercive sanctions against the City itself before it started fining individual councilpersons. *Id.* at 277. Thus, the sanctions against the legislators themselves were unnecessary (at least in the first instance) and the trial court therefore abused its contempt discretion. *Id.* at 280. As mentioned above, the Court did not make a specific holding regarding legislative immunity. *Id.* at 274.

Notably, however, four justices of the Supreme Court dissented in *Spallone*. Led by Justice Stevens, the dissenters disagreed that the trial court had abused its contempt discretion. *Id.* at 291 (Stevens, J., dissenting). The dissent thus reached the question of legislative immunity not decided by the rest of the Court. Justice Stevens explained that "once a federal court has issued a valid order to remedy the effects of a prior, specific constitutional violation, the representatives are no longer 'acting in a field where legislators traditionally have power to act.'" *Id.* at 301 (citing *Tenney*, 341 U.S. at 379). "At this point, the Constitution itself imposes an overriding definition of the 'public good,' and a court's valid command to obey constitutional dictates is not subject to override by any countervailing preferences of the polity, no matter how widely and ardently shared.'" *Id.* In other words, the four dissenting justices agreed with the Second Circuit that they "[do] not consider legislative immunity to be a defense to [court] orders issued to vindicate the authority of a federal court." *United States v. Yonkers*, 856 F.2d 444, 457 (2nd Cir. 1988) (citation omitted).

The reasoning in *Spallone*, *Bogan*, and *Amy* applies directly to this case. Here, the State itself is a valid defendant under Title II and can be ordered to undertake remedial actions for violations of the ADA. *See* 42 U.S.C. § 12131(1)(A) (definitions); 42 U.S.C. § 12132 (prohibition against discrimination); 42 U.S.C. § 12133 (incorporating 42 U.S.C. § 794a, which authorizes injunctions, as remedies for violation of Title II); *see also Seminole Tribe v. Fla.*, 517 U.S. 44, 56-57 (1996) (discussing circumstances under which states can be sued directly).

If the House fails to comply with remedial measures imposed upon the State by court order, the Court could then enforce its orders on individual legislators or (more likely) the Clerk of the House. *Attorney-General ex rel. Holden v. Colburn*, 62 N.H. 70, 75 (1882) ("The counting the votes, and ascertaining the majorities, and giving certificates of the result, are mere ministerial acts."). Such an order would not implicate legislative immunity. *Bogan*, 523 U.S. at 51; *Spallone*, 493 U.S. at 291 (Stevens, J., dissenting); *Amy*, 78 U.S. at 138; *Yonkers*, 856 F.2d at 457 (rev'd on other grounds); *see also Bush v. Orleans Parish School Board*, 188 F. Supp. 916, 922 (E.D. La. 1960) (three-judge court), *aff'd*, 365 U.S. 567 (1961) (granting injunction against state legislature and its members because of their interference with desegregation of public schools and rejecting defense of legislative immunity).

In sum, the State is a proper defendant in this Title II action. The case law is clear that the State cannot assert legislative immunity. The case law also holds that once a judgment is imposed upon the State, enforcement of that judgment against individual legislators cannot be stymied by legislative immunity. As such, legislative immunity is no bar to this action.

**B. Additional differences between the original Complaint and the First Amended Complaint require the Court to conclude legislative immunity does not bar Plaintiffs' claims at the motion to dismiss stage.**

**1. The law of the case doctrine is inapplicable in this case.**

Defendants complain that Plaintiffs' position is barred by law of the case doctrine citing *United States v Matthews*, 643 F.3d 9, 12 (1st Cir. 2011). Defendants are wrong. The Court in *Matthews* recognized the "law of the case doctrine is not a straightjacket for a court," and should not apply in the absence of a developed and adequate record where "significant new evidence, not earlier obtainable in the exercise of due diligence [ ] has come to light . . . ." *Id.* at 14. The en banc opinion itself repeatedly pointed out the severely and undeveloped nature record. See, e.g., *Cushing*, 30 F.4th at 35, 50, 52, 61. The sparse record was the direct result of the decision of the Defendants not to file a motion to dismiss the original Complaint, which made it impossible for the Plaintiffs to amend their complaint earlier in order to bring new facts before the Court. *See id.* at 35. Defendants concede the record is limited by quoting the en banc opinion's observation that issues in the case were "barely developed in the District Court or before the panel". *See* Doc. no. 51-1 at 6, 22. Defendants' choice not to file a motion to dismiss with their opposition to Plaintiffs' motion for preliminary injunction created a procedural posture that prohibited Plaintiffs' from filing an amended complaint to raise "significant new evidence" raised in the FAC that was not "earlier obtainable in the exercise of due diligence" both because of the changing landscape of the Covid-19 pandemic and the procedural bar created by Defendants' failure to move to dismiss the original Complaint. Thus, under *Matthews*, the law of the case doctrine does not apply in this case.

**2. The First Amended Complaint is replete with newly alleged and discovered facts and newly named Defendants that defeat the application of legislative immunity to bar Plaintiffs' claims at the motion to dismiss stage.**

As alleged in the FAC, the evolving scientific and medical landscape of the ongoing danger that exposure to Covid-19 creates for Plaintiffs establishes the stark and still lethal threat that Defendants' refusal to provide reasonable accommodations has posed to the Plaintiffs. In addition,

the death of Representative Cushing clearly establishes the reality that, contrary to the allegations of Defendants, exposure to Covid-19 represents a direct threat to the lives of persons with some of the ADA-qualifying disabilities of Plaintiffs, notwithstanding the availability of vaccines and treatments that might serve to lessen the danger to younger and healthier persons.

Further, the addition of the State and the House as defendants as well as further information about the receipt of federal funding for Covid responses on the part of the House itself establishes that the House received and expended federal funds to provide safety accommodations for healthy representatives while absolutely refusing to even consider any accommodations whatsoever for the disabled.

Relatedly, the House and its clerk are named as defendants in the FAC. Plaintiffs also allege facts of the acceptance and use of federal funds for Covid accommodations which operate as a waiver of any defense. Neither the addition of the House as a defendant nor the factual allegations concerning the acceptance and use of federal funds are acknowledged or analyzed in the Motion to Dismiss and this alone is sufficient to allow the matter to proceed to discovery and trial.

Importantly, Plaintiffs allege for the first time in the FAC based on newly acquired information that other states have deemed that designating separate areas for the immunocompromised within the State House complex would not constitute "remote attendance" and thus would not trigger *Masons* Rule 786. FAC at ¶ 39. The Defendants have never even pretended to consider such even more limited accommodations.

With respect to the addition of the clerk as a defendant, predictably, Defendants argue that Harwood cloaks him with legislative immunity as well. Defendants are wrong. While *Harwood* read alone might support a conclusion that legislative immunity might apply to the clerk as a legislative employee, this conclusion would run afoul of controlling precedent in Powell v

McCormack, 395 U.S. 486, 489, 506-508 (1969) that the First Circuit found inapposite in the en banc opinion, but which would apply now that the clerk is a named defendant, and an order of this Court to provide reasonable accommodations would run against him, not a legislator, in a scenario which is the functional equivalent of Plaintiffs not be allowed to "take [their] seat[s]" and perform their essential legislative duties of voting and representing their constituents. Furthermore, the role of the clerk played in the adoption of Rule 786 of the 2022 *Mason's Manual of Legislative Procedure* was completely unknown at the time of the filing of the original Complaint. In discussing this rule, the Court found that the Speaker was relying upon an existing provision in Section 786 and not one enacted to gain an unfair advantage and not targeted at any class of legislators either expressly or through clever artifice, in part because it involved adhering to existing rules rather than making new ones. *Cushing*, 30 F.4th at 51. "The remedy for that decision to stick to new rules, we also note, in an injunction that would run against a legislator and not merely a legislative employee." *Id.* While all this might be true in another context, here Plaintiffs allege sufficient facts that the rule was created with input from the clerk while the question of remote participation was an ongoing issue in the House. The Clerk was involved in the adoption of Rule 786 through his membership on the *Mason's* drafting committee which in turn he obtained because he was an employee of the House. At the time he was helping to draft and enact Rule 786, he was likely aware that it was contrary to the goals of his employers. He apparently not only voted for the rule but further failed to notify anyone at *Mason's* when the House sought the Advisory Opinion from the New Hampshire Supreme Court that ultimately stated that remote participation was permissible under the New Hampshire Constitution. The reasonable inference from all these alleged facts supports the Plaintiffs' conclusion that the actions of the clerk contributed to a "clever

artifice" designed to deprive disabled Democratic legislators of their ability to have meaningful participation in the legislature.

Moreover, the FAC reflects the newly discovered fact that Section 786 is not in itself the controlling section. As stated in the amended complaint, three persons involved with the drafting of *Mason's* have informed Plaintiffs that the New Hampshire Supreme Court's opinion authorizing remote attendance would be a judicial constitutional decision under *Mason's* Section 4.2 rendering Section 786 inapplicable to New Hampshire. While this may not be a new fact—Section 4.2 was in fact in existence throughout the litigation. Plaintiffs' failure to discover it is reasonable given that *Mason's* is 804 pages long and contains no less that 807 sections. Section 4.2 is less than a half page in length and found 584 pages away from 786. Less understandable is the failure of the clerk, a member of the drafting committee, to bring this section to the attention of the Plaintiffs or this Court. This failure is evidence that Plaintiffs are entitled to develop in discovery. FAC at ¶ 33.

The First Circuit wrongly assumed that the remote meetings in the New Hampshire Senate were conducted pursuant to the authority of a now lapsed executive emergency order. *Cushing*, 30 F.4th at 34 n.4. The Amended Complaint makes it clear that the Senate continues to meet remotely because it is authorized under the New Hampshire Constitution.

The partisan nature of the votes on remote attendance alleged in the FAC are facts that make a reasonable inference that the intent of the denial of accommodations were in fact a clever artifice intended to deprive the Plaintiffs of their right to participate in the House, and limit their rights of free speech and association.

The deaths of two Plaintiffs as well as the recent elections have resulted in situation where only two Plaintiffs, Cote and DiLorenzo, continue to sit in the House. Others such as Berch were defeated in elections in which their inability to attend in person was an issue. Former Rep Berch

has said that he cannot run again without accommodations but that he would consider doing so if he had a way to adequately represent his constituents. At any rate, that fact that there are only two Plaintiffs still in the House are new facts that lessen any putative burden of accommodations and render the refusal to provide them even more extraordinary. Further, the 2022 election resulted in the most closely divided House in New Hampshire history, thus rendering every vote critical.

The facts alleged in the new complaint establish that the bills with critical importance to the people of New Hampshire are routinely decided by very small margins. These votes implicated both the bodily autonomy of women and a gerrymandering scheme that will deny democracy for a ten-year period which were each initially tied until the Speaker voted. All this is powerful evidence that the extraordinary refusal of accommodations is aimed directly at suppressing a political point of view.

> **3.  Even if legislative immunity would otherwise apply in this case, which it would not, the "extraordinary character" of the Defendants actions strips them of any potential legislative immunity.**

Plaintiffs have pleaded sufficient facts in the FAC to overcome a motion to dismiss based on legislative immunity on the basis that Defendants' actions in denying reasonable accommodations possess an "extraordinary character" so extreme as to remove any protections of legislative immunity. To begin with, while most issues implicating legislative immunity involve conflicts between separate branches of government, such as where actions of the executive threaten to affect the ability of a legislator to fulfill their duties, this case is unusual in that it represents an intra-House conflict in which the actions of the House and its officers are designed to and have resulted in multiple representatives being unable to fulfill their legislative duties. No case cited by the Defendants requires or condones the application of legislative immunity to shield the affective removal of multiple members of the legislature. No court has countenanced an effort by members

of a majority party to remove members of a minority party in order to affect the outcome of votes the majority party knows will be decided by a single-digit margin. In no case cited by Defendants was the defendant employee a person who was involved in the drafting of a challenged new rule that affected the balance of power in the legislature in a manner from which one may reasonably infer a clever artifice to silence the voice of a rival political point of view.

The threats posed to the Plaintiffs are potentially lethal. No one should have to accept a 77% increased risk of fatal heart attack in order to sit as a state representative and fulfill their own legislative duties. No one should have to expose themselves to a virus that not only directly kills elderly people with disabilities at an astonishingly high rate, but also kills indirectly as it did to former plaintiff Cushing. Nothing that is being asked of Defendants is difficult or expensive. Government bodies and agencies, including this Court and the New Hampshire Senate, have all implemented videoconference capabilities and prophylactic measures such as distancing, masking, and mandatory rapid testing, without incident. Therefore, Defendants' refusal—for political gain—to take minimal steps to protect their colleagues by affording them reasonable accommodations—nothing extraordinary—is itself of such an extraordinary and shocking character that it would be a miscarriage of justice to permit legislative immunity, a judicially created doctrine, to shield such outrageous, anti-democratic conduct.

## II.     Plaintiffs' state-law claims are not barred by the Eleventh Amendment and this Court should exercise supplemental jurisdiction over them.

Finally, Defendants argue that this Court is precluded "from adjudicating causes of action premised on violations of state, rather than federal, law." DEFS.'S MOL at 24. However, 28 U.S.C. § 1367 provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are

so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

State officials are not protected by Eleventh Amendment immunity, even for state law claims, "if they are acting ultra vires, that is without proper authority." *Miami University Associated Student Government v. Shriver*, 735 F.2d 201, 204 (6th Cir. 1984). This "*ultra vires* exception rests on the 'officer's lack of delegated power.'" *OA VW LLC v. Mass. DOT*, 76 F. Supp. 3d 374, 378 (D. Mass. 2015). "The test for determining the applicability of such exception is whether the officer's action, even if legally erroneous, was beyond the scope of his statutory authority." *Id.* (cleaned up).

Here, Plaintiffs have made allegations that the Defendants acted beyond the scope of their statutory authority. Their actions were therefore *ultra vires* and Eleventh Amendment immunity does not apply.

Additionally, the Eleventh Amendment only provides protections if the state has not consented to suit. *Seminole Tribe*, 517 U.S. at 54. In New Hampshire, legislators and the legislature may be subject to suit for violations of the New Hampshire Constitution. *See Burt v. Speaker of the House of Representatives*, 173 N.H. 522, 526 (2020). As such, the Eleventh Amendment does not bar Plaintiffs' state constitutional claims.

## Conclusion

For the reasons stated herein, the Court should deny Defendants' Motion to Dismiss as to all counts.

Date: January 13, 2023                         Respectfully Submitted,

REP. ROBERT "RENNY" CUSHING
(INDIVIDUALLY AND IN HIS CAPACITY AS
MINORITY LEADER OF THE NH HOUSE OF
REPRESENTATIVES), REP.  DAVID COTE,
REP. KENDALL SNOW, REP. KATHERINE
ROGERS, REP. PAUL BERCH, REP. DIANE
LANGLEY, REP. CHARLOTTE DILORENZO

By and through their attorneys

Dated: January 13, 2023                    */s/ Israel Piedra*
Israel F. Piedra, Esq., NH Bar No. 267568
Welts, White & Fontaine, PC
29 Factory Street
Nashua, NH 03060
(603) 883-0797
ipiedra@lawyersnh.com

Dated: January 13, 2023                    */s/ Paul Twomey*
Paul Twomey, Esq., NH Bar No. 2589
P.O. Box 623
Epsom, NH 03234
paultwomey@comcast.net
(603) 568-3254

and

NEW HAMPSHIRE DEMOCRATIC PARTY

By its attorney

Dated: January 13, 2023                    */s/ William E. Christie*
William E. Christie, Esq., N.H. Bar no. 11255
S. Amy Spencer, Esq., N.H. Bar no. 266617
Shaheen & Gordon, PA
107 Storrs Street
PO Box 2703
Concord, NH 03302
(603) 225-7262
wchristie@shaheengordon.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be served conventionally on all parties or their counsel.

Dated:  January 13, 2023                    */s/ S. Amy Spencer*
                                                          S. Amy Spencer